**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ANNI MA,

                      Plaintiff,

       v.

CITY OF LOS ANGELES, et al.,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 16-5819 DMG (RAOx)

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [56]**

     This matter is before the Court on the motion for summary judgment or, in the alternative, partial summary judgment ("MSJ") brought by Defendants City of Los Angeles (the "City"); City of Los Angeles Police Department ("LAPD" or the "Department" and, with the City, "Municipal Defendants"); Officer David Weston #28719, individually and in his official capacity as a Police Officer; Officer Elmer Fernandez #38391, individually and in his official capacity as a Police Officer; Sergeant David Martinez #32878, individually and in his official capacity as a Police Officer; Sergeant Rudy Vidal #23398, individually and in his official capacity as a Police Officer; and Sergeant Hope Young #33443, individually and in her official capacity as a Police Officer (collectively, "Officer Defendants").   [Doc. ## 56, 56-1.]   For the reasons set

forth below the Court **GRANTS** the MSJ as to all of Plaintiff's federal claims, declines to exercise supplemental jurisdiction over the remaining state law claims, and **DISMISSES without prejudice** the state law causes of action.

# I.

# PROCEDURAL BACKGROUND

Plaintiff Anni Ma filed this civil rights action on August 4, 2016.  [Doc. # 1.]  She filed the operative First Amended Complaint ("FAC") on March 7, 2017.  [Doc. # 28.] The FAC raises the following claims against the Officer Defendants pursuant to 42 U.S.C. section 1983:  (1) unlawful seizure; (2) unreasonable and excessive use of force; (3) due process violations; (4) equal protection violations; and (5) First Amendment violations.  *Id.*  The FAC also alleges against the Municipal Defendants unconstitutional municipal customs and policies in violation of section 1983 (the "*Monell*[1] Claim").  *Id.* Plaintiff further alleges state law claims against all Defendants for false arrest/imprisonment, assault and battery, and negligence under California law.  *See id.*

Defendants filed the MSJ on August 9, 2017.  [Doc. ## 56, 56-1.]

Thereafter, on August 15, 2017, the parties stipulated to the dismissal of former Defendant Officer Luz Bermudez #38268, who was sued in his individual and official capacities, as well as the seventh and eighth causes of action for violations of California Civil Code sections 51.7 and 52.1, respectively.[2]  [Doc. ## 28, 60, 61.]  In response, the Court denied as moot the MSJ as to Bermudez and the motion for summary adjudication as to the seventh and eighth causes of action.  [Doc. ## 62, 63.]

---

[1] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

[2] As originally filed, Bermudez also moved for summary judgment.  [Doc. # 56 at 2.]

## II.

## REQUEST FOR JUDICIAL NOTICE & SEALING APPLICATION

Plaintiff filed a Request for Judicial Notice ("RJN") of a Los Angeles City Attorney Complaint Screening form. [Doc. # 66.] Because the Court need not consider it in ruling on the MSJ, the Court **DENIES** the RJN as moot.

## III.

## FACTUAL BACKGROUND

This matter concerns Plaintiff Ma's exposure of her breasts, including her nipples and areolas, at a political rally in Los Angeles, and her ultimate arrest for indecent exposure under California law. The Court sets forth the following uncontroverted material facts.

**A.    Rally at the Wiltern Theater**

On March 23, 2016, members of the LAPD were present outside the Wiltern Theater in Los Angeles before and during a political rally for then-presidential-candidate Senator Bernie Sanders, in anticipation of protests and counter-protests between rival candidates and their supporters and detractors. Statement of Uncontroverted Facts ("SUF") at ¶ 1 [Doc. # 65].[3]  Plaintiff was a Sanders supporter who attended the event and arrived outside the Theater at around 5:00 p.m. *Id.* at ¶ 2. At that point, there were approximately 100 people in line to enter the Theater. *Id.* at ¶ 7.

Plaintiff wore a dress that covered her breasts, but she had the intention of presenting herself topless, or "top-free," with pieces of tape that covered her nipples and areolae. *Id.* at ¶ 3. Written on the tape were the words, "Free the Nipple." *Id.* at ¶ 6. She also wrote the word "Equality" on her chest and carried a white board on which she wrote, "Free the Nipple #Equal Rights Amendment #Feel The Bern." *Id.* at ¶¶ 4, 6. Free the Nipple is an activist organization or campaign with the objective of desexualizing the

---

[3] Plaintiff's additional SUF, with Defendants' responses, is found at Doc. # 73.

female body and, specifically, female breasts and nipples. *Id.* at ¶ 61.[4]   Activists or participants in Free the Nipple demonstrations attempt to achieve this goal by appearing in public top-free to normalize the image. *Id.*; Hebron Depo. at 21:22–22:4 [Doc. # 67-2].

Plaintiff walked around the city blocks bounded by Western Avenue, Wilshire Boulevard, Seventh Street, and Oxford Street. *Id.* at ¶ 10.[5]   Her chest was exposed, with the exception of the tape that covered her nipples and areolae. *Id.*   As she walked, she chanted "Free the Nipple," "Gender Equality," "ERA," and "Equal Rights Amendment." *Id.*   During her trips along the route, the line outside the Theater grew to approximately 500 people, which included adults and children as young as five-years-old. *Id.* at ¶¶ 11, 13.   Throughout Plaintiff's demonstration, over a period of about one and one-half hours, she spoke to several passersby or people waiting in line to enter the Theater and had about 100 short but "intimate" conversations or interactions about the Free the Nipple movement. Ma Depo. at 128:24–131:21 [Doc. ## 57-1, 67-3].[6]   People also approached

---

[4]   Defendants' evidentiary objections to the Tiernan Hebron deposition testimony are **OVERRULED**.   Hebron's deposition testimony is authenticated under Federal Rule of Evidence 901(b)(4). *See Hill v. Opus Corp.*, 464 B.R. 361, 368 n.11 (C.D. Cal. 2011) (collecting cases); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony. . . ."). As to the relevance of this particular portion of the deposition testimony, the purpose of the Free the Nipple campaign is probative of Plaintiff's conduct that led to her arrest and the legal arguments underlying some of her claims—*i.e.*, men are permitted to appear in public topless without legal repercussion, whereas women most often are not—and is therefore relevant.   The Court rules on the evidentiary objections as the evidence is relevant to this decision.   To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objection is **OVERRULED** as moot.

[5]   Plaintiff's friend, Tiernan Hebron, also participated in the Free the Nipple demonstration and walked around top-free with tape covering her nipples and areolae and with political messages written on her body.   SUF at ¶¶ 9–10.   Because Hebron is not a party to this suit, the Court focuses solely on Plaintiff's actions and the police officers' response to her conduct.

[6]   Defendants' authentication objection to the Anni Ma deposition testimony is **OVERRULED** because Defendants' copy of the same deposition was properly accompanied by a signed reporter's certification, thus satisfying the authentication requirement for both parties.   *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject

Plaintiff to take photographs with her, and she posed for about 30 photographs.  SUF at ¶ 15.

After about an hour, Plaintiff removed the tape and exposed her nipples and areolae.  *Id.* at 17.  She explained that her "[f]reedom of choice" prompted her to remove the tape, saying, "I have the ability to choose when I want to be top-free, and that was a moment I felt okay with being top-free."  Ma Depo. at 133:7–9.  She further explained that she removed the tape when she did because it was not illegal to be top-free where she was, geographically, and that she felt physically safe and not in any danger at that point in part because she was near the entrance to the Theater.  *Id.* at 133:12–13, 135:24–25, 138:1–13.

## B.    Plaintiff's Arrest

From the time that Plaintiff arrived at the Theater, she saw LAPD officers present.  SUF at ¶ 16.  While she had the tape covering her nipples, the officers did not interfere with her speech or demonstration conduct.  *Id.*  After she removed the tape, that changed.

Defendant Officer David Weston spoke with Defendant Sergeant David Martinez about Plaintiff's full breast exposure, and Martinez advised Weston that Plaintiff could be subject to arrest.  Fernandez Depo. at 16:16–17:3 [Doc. # 57-3]; Weston Depo. at 41:7–14 [Doc. ## 57-4, 67-5].  Martinez instructed the officers first to tell Plaintiff to cover her nipples and areolae, or else she would be arrested.  Fernandez Depo. at 40:5–8; Weston Depo. at 42:18–25.  Martinez contends that, in addition to instructing the officers to warn Plaintiff, he also warned Plaintiff to cover up or else she would be arrested for indecent exposure.  Martinez Depo. at 89:17–20.

---

to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity."). To the extent that the parties have presented different page excerpts of the testimony such that Defendants' authenticated exhibit does not extend to Plaintiff's exhibit, the Court **OVERRULES** the objection for the reason provided in footnote 4, *supra*. *See id.* at 776 n.16 (court not required to deem one party's exhibit authentic on basis of another party's authenticated exhibit when different pages are submitted by the parties).

According to Defendant Officer Elmer Fernandez, Weston's partner, he twice told Plaintiff to cover up. Fernandez Depo. at 16:22–23, 41:13–15. First, Fernandez warned her while she was walking. *Id.* at 41:18. Fernandez contends that she looked in his direction and acknowledged him but then turned around and attempted to walk away. *Id.* at 41:18–22. He warned Plaintiff a second time when he attempted to detain her, in order to warn her, by placing her against a light pole. *See id.* at 40:13–14, 42:1–3. Thereafter, according to Fernandez, Plaintiff tried to escape the detention, and he used force to put her in handcuffs and arrest her. *Id.* at 40:15–23, 42:1–7. Specifically, Fernandez used a "firm grip" applied to her left and right wrists, applied a "twist lock" to the right wrist, and used his body weight (approximately 184 pounds) and placed one of his knees on the middle of her back to control her. *Id.* at 77:15–78:16, 80:11–19. Fernandez's deposition testimony does not provide further specifics, except that his intent to detain Plaintiff changed to an intent to arrest her once he believed she attempted to escape detention. SUF at ¶ 40.

Plaintiff asserts that the first and only warning to cover up that she received was when Fernandez grabbed her hand and put her against the light pole. Ma Depo. at 146:21–147:2. Specifically, while she was walking in one direction, Fernandez[7] grabbed her right wrist from the other direction, and she moved in the opposite direction from the officer in "respon[se] to the grab." *Id.* at 149:10–24. Fernandez then pushed her toward the light pole on the corner of the street, twisted her arm behind her back, and ordered her to put on a shirt. *Id.* at 151:1–9. In response to the warning she did nothing, so as to exercise her Fifth Amendment right to remain silent. *Id.* at 147:5–13, 153:1–3. She never made any effort, or express to Fernandez a desire, to cover up her breasts. *Id.* at 161:21–163:1. While Plaintiff was standing silently, Fernandez grabbed her left hand, which was free, told her he was going to arrest her, and arrested her by "pull[ing] both of [her] hands behind [her] back." *Id.* at 166:8–167:6, 167:16–24, 168:5–8.

---

[7] Plaintiff did not testify that Fernandez was the officer, but it is undisputed that he was the officer. *See* SUF at ¶ 77.

Plaintiff testified that while she was standing at the light pole, even when the officer said he would arrest her and put both of her hands behind her back so as to arrest her, she was not handcuffed.  *Id.* at 170:2–9.  Although Plaintiff does not "remember the specifics" or have an "exact recollection" of how the arrest occurred, she recalls that she moved—tried to adjust her position—in response to the force applied to her hands behind her back and the pain she felt in her right shoulder from that force.  *Id.* at 167:15, 167:25, 170:10–25, 174:4–23.  She also recalls, without specifics, that her body hit a table and then she fell to the ground, and that throughout this event she was moving her body to relieve the pain she felt from the pressure on her shoulders.  *Id.* at 173:2–174:23.  The next memory she has is being put into the police vehicle.  *Id.* at 178:6–11.

Video footage of the scene, which Plaintiff provided, shows the detention and eventual arrest.  Lodged Exhibit, Videos 1–2 [Doc. # 58].  The footage shows Fernandez holding on to Plaintiff's right arm with his right arm while Plaintiff heads (or attempts to head) in one direction; guiding and pulling her in the opposite direction toward what appears to be a light pole on the sidewalk corner, with his left hand on the outside of her left arm and his right arm holding her right arm behind her back; and placing her upright and face-forward against the light pole with her right arm twisted behind her back.  Video 2 at 0:04–0:08.  The officer continues to stand behind Plaintiff and slightly to the right, holding her arm in that position, and speaking to her on her right side.  *Id.* at 0:08–0:14, 0:16–0:23.  While the officer speaks to Plaintiff, she remains silent for several seconds.  *Id.* at 0:16–0:23.  His communication to Plaintiff is inaudible.  At this point, both Plaintiff and Fernandez are facing the light pole, with their right sides (profile) facing the camera.  At no point does Fernandez appear to increase or intensify his use of force in restraining Plaintiff.

Video 2 next shows, rather suddenly, Plaintiff yelling inaudibly and moving toward her right, with her face and torso facing the camera, almost perpendicular to Fernandez, and he appears to be attempting to restrain or brace her with his right arm.  *Id.* at 0:24–0:25.  The camera then pans up the light pole toward the sky, then back down to

show Plaintiff, low to the ground, facing Fernandez and pulling away from him while he holds on to her right hand or wrist with both of his hands.  *Id.* at 0:25–0:29.  At that point, Fernandez is standing but crouching down slightly toward Plaintiff as if to counter-balance her weight.  A male security guard for the Wiltern then assists Fernandez in getting Plaintiff upright and to her feet.  *Id.* at 0:29–0:32; Video 1 at 0:24–0:27; SUF at ¶ 41.

After Plaintiff is back on her feet, video footage shows her again moving away from Fernandez and the security guard.  Video 1 at 0:28–0:30.  Fernandez is shown walking Plaintiff slowly toward a table of Sanders t-shirts and memorabilia that stands a couple of feet away from the light pole.  *Id.* at 0:32–0:40; Fernandez Depo. at 95:12–14 (distance).  Fernandez is standing behind Plaintiff, with his right arm holding her right arm behind her back.  Video 1 at 0:39–0:41.  Plaintiff is bent forward over the table, while Fernandez remains standing behind her, attempting to put both of her hands behind her back.  *Id.*; Video 2 at 0:33.  The camera follows Fernandez and Plaintiff as she tries to flee his grasp or otherwise resist—she is facing away from him, her body leaning or pulling away from him, with both feet on the ground, and both arms extended out, behind her—but Fernandez holds on to her wrists (one wrist in each hand) as she lowers to the ground, face down, with her legs at times kicking behind her, and ultimately restrains her.  Video 1 at 0:41–0:52; Video 2 at 0:33–0:48.  The video shows one third-party female civilian touch Plaintiff's legs, in what appears to be an attempt to gain her attention, while yelling, "Don't fight, don't fight."  Video 2 at 0:38–0:45; *see also* Video 1 at 0:47–0:54 (woman assisting officers).  Male voices are also heard repeatedly saying, "Stop" and "Please don't resist."  Video 2 at 0:40–0:43, 0:55–0:58; Video 1 at 0:48–0:54.  The security officer retrieves Fernandez's handcuffs from his police belt.  Video 2 at 0:45–0:48; SUF at ¶ 41.  Video 1 shows Fernandez handcuffing Plaintiff with his knee pressed into the middle of her back, consistent with his deposition testimony.  Video 1 at 0:58–1:01.

Once Fernandez successfully handcuffs Plaintiff, officers lift her up onto her feet and walk her toward, and eventually inside, the police vehicle.  Video 2 at 0:59–2:22; SUF at ¶ 43.  Plaintiff is captured smiling, at times yelling "Free the nipple" or "Gender equality," and resisting entering the police car.  *See* Video 2 at 0:59–2:22; SUF ¶ 44.  Plaintiff was arrested at approximately 6:20 p.m.  Fernandez Depo. at 15:22–16:18; Weston Depo. at 22:10–15.

**C.    Penal Code Section 314(1) Determination**

Ultimately, Fernandez and Weston made the determination that Plaintiff should be arrested for indecent exposure, a misdemeanor under California Penal Code section 314(1).  Weston Depo. 28:2–7; Fernandez Depo. at 16:16–16:18.  Prior to submitting the booking paperwork in connection with Plaintiff's arrest to their watch commander, Defendant Sergeant Hope Young, Fernandez and Weston consulted the Penal Code book.  Fernandez Depo. at 48:23–49:4.   Young approved Plaintiff's booking for indecent exposure.  Young Depo. at 18:11–21 [Doc. ## 57-5, 67-12].  Defendant Sergeant Rudy Vidal, who was the approving supervisor that night, reviewed the probable cause determination and signed off on the arrest report.  Martinez Depo. at 53:9–14; Fernandez Depo. at 51:16–23.

Although no one in the crowd outside the Theater complained to Sergeant Martinez about Plaintiff's exposed chest, or to her friend (who also participated in the Free the Nipple demonstration), people approached Weston and complained—both when Plaintiff had tape covering her nipples and areolae and when those areas of her chest were exposed.  Martinez Depo. at 84:1–11 [Doc. ## 57-2, 67-11]; Hebron Depo. at 111:4–7; Fernandez Depo. at 35:20–23; Weston Depo. at 52:5–13.   One woman specifically complained to Weston that she was offended, and he heard comments from people in the crowd as to their being offended.  Weston Depo. at 19–23.  Fernandez also testified as to complaints received by people who were offended and as to chatter or

1  commentary he overheard, but the officers did not obtain the complainants' names.

2  Fernandez Depo. at 24:2–22, 35:1–23.[8]

3      Weston observed Plaintiff drawing attention to her exposed breasts and considered

4  Plaintiff's actions, including the complete exposure of her breasts, "lewd."   Weston

5  Depo. at 47:24–25, 48:5–17, 50:22–25, 55:18–21, 56:11–14.   Fernandez believed that

6  Plaintiff was drawing attention to her breasts and that she felt gratified by the attention

7  she received.   Fernandez Depo. at 37:1–2, 37:17–19.   He also sensed that people in the

8  crowd were offended by Plaintiff's conduct.   Id. at 37:15–16.   Martinez, who told Weston

9  that Plaintiff was subject to arrest, based his belief that Plaintiff's conduct fit the offense

10  of indecent exposure on the fact that her nipples were exposed in public.   Martinez Depo.

11  at 89:25–90:7.   He further believed that Plaintiff was intending to challenge social norms,

12  get a reaction out of people nearby, and offend people, in part because of the public

13  nature of her actions and of the atmosphere (near a public library and a park area where

14  families and children were present).   Id. at 90:7–21.

15      Additionally, several of the Officer Defendants were trained on sex crimes at the

16  Los Angeles Police Academy (the "Academy").   Fernandez's sex crimes education,

17  which occurred in or around 2007 or 2008, was pursuant to the Peace Officers Standards

18  and Training ("POST") Learning Domain, which classifies the female breast as both a

19  "private part" and an "intimate part" of the body.   SUF at ¶ 54; Fernandez Depo. at 30:7–

20  9.   Weston similarly received instruction on sex crimes at the Academy, including

21  indecent exposure under California law.   SUF at ¶ 55.   His understanding of the law is

22  that it does not necessarily require the exposure of genitals.   Id.   He further testified that

23  the LAPD does not have a specific policy with regard to the hypothetical of a woman

24  walking around the City topless with her nipples exposed, but that an LAPD officer

25  would need to make a determination based on an interpretation of the conduct in relation

26  _____

27  [8] Plaintiff's hearsay objections to out-of-court complaints and commentary received and overheard by Fernandez and Weston are **OVERRULED**.   The statements show the effect on the listeners (the officers) and the officers' state of mind and motive for effectuating Plaintiff's eventual

28  arrest for indecent exposure.

to the Penal Code.  Weston Depo. at 9721–98:8.  Like Fernandez and Weston, Young also received training at the Academy, and she attended a subsequent seminar on sexual deviance between 2006 and 2008.  SUF at ¶ 56.  In that seminar training, she was not taught that under section 314 an offender must willfully expose his or her genitals, but her understanding of the law, based on her training with the LAPD, is that it requires willfulness and genital exposure and that "private parts" include the female breast, the groin, the anus, and the buttocks.  Young Depo. at 24:6–25:19.[9]

**D.   Plaintiff's Harm**

Plaintiff spent about one day in jail, and no criminal charges were filed against her.  Ma Depo. at 211:20–22, 247:3–15.

Plaintiff testified that her back, right shoulder, and wrist felt "off" and "did not feel good" after her arrest.  Ma Depo. at 201:10–21.  She also sought medical treatment for a urinary tract infection that she attributes to her jail stay, which cost her $18 and change for a medical prescription.  *Id.* at 210:20–211:16.  Plaintiff also contends that she suffered emotional trauma from the arrest, including depression that presents in the form of fear, but she has not sought any psychological treatment and the fear does not preclude her from attending or participating in top-free activist events.  *Id.* at 224:21–226:15.  Indeed, Plaintiff has been arrested since the events underlying this lawsuit, and she testified that "[e]very time [she is] arrested it is a traumatizing event."  *Id.* at 226:2–12.

The parties have stipulated that there are no future medical or pharmaceutical expenses, and no past or future psychiatric expenses.  SUF at ¶ 60.

---

[9] The Court **OVERRULES** Defendants' evidentiary objection to page 24, lines 13-15 and 21–25 of the Young deposition testimony.  As the officer who approved Plaintiff's booking for indecent exposure, the line of questioning did not require a legal conclusion, as in a lawyer's pontification of the statutory elements of indecent exposure, but rather elicited testimony about her training and understanding of her duties and obligations as a law enforcement officer who approves an offender's arrest and booking under a particular statute.

# IV.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment. *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013); *see also Asuncion v. Dist. Dir. Of U.S. Immigration & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970) (district court properly resolved motion for summary judgment where issues presented were comprised solely of questions of law).

# V.

# DISCUSSION

Defendants advance many grounds for summary adjudication. Because Defendants assert that qualified immunity bars all but one of Plaintiff's federal claims, the Court turns first to the qualified immunity defense.

## A.   Qualified Immunity

Defendants argue that this doctrine bars Plaintiff's claims for unlawful seizure, use of unreasonable and excessive force, and equal protection, due process violations, and First Amendment violations.  MSJ at 11.[10]  "At worst," say Defendants, Plaintiff's arrest and detentions were the result of the Officer Defendants' reasonable interpretation that California Penal Code section 314(1)'s "private parts" language includes bare female breasts, as well as their reasonable conclusion that Plaintiff's conduct outside the Wiltern Theater was "lewd" under the statute.  *Id.* at 7.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Notably, the applicability of qualified immunity is a pure question of law.  *Torres v. City of Los Angeles*, 748 F.3d 1197, 1210 (9th Cir. 2008).  This determination involves two parts:  a "constitutional inquiry," wherein the court decides "whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment," and a "clearly established" inquiry, wherein the court decides whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).  The court decides which part of the qualified immunity analysis to undertake first, and "[f]ailing at

---

[10]  Because Defendants' MSJ spans two docket entries, the Court's pin citations follow the pagination assigned by Defendants.  In all other briefing papers, the Court's citations follow the pagination assigned by the CM/ECF docketing system.

either one" will defeat Plaintiff's claims. *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016).

### 1.    Unlawful Seizure

On this claim, the Court turns first to the clearly established inquiry.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Aschroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  Supreme Court precedent "do[es] not require a case directly on point," but clearly established law should not be defined "at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741, 742).  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" and that inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* (quoting *al-Kidd*, 536 U.S. at 742; *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)).

Plaintiff bears the burden of proving that the right at issue was clearly established. *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011).  She fails to do so.  Notably, Plaintiff did not point to a single case, in the context of any of her claims, that "placed beyond debate the unconstitutionality of" the Officer Defendants' actions.  *See Hamby*, 821 F.3d at 1091 (quoting *Taylor v. Barkes*, 135S. Ct. 2042, 2044 (2015) (*per curiam*)); *see also Williams v. City of Los Angeles*, No. CV 14-4803 JFW (MRWx), 2016 WL 3951398, at *8 (C.D. Cal. June 17, 2016) ("Plaintiff identifies no judicial decision or other statement of the law that 'placed beyond debate' a prohibition on arresting a topless woman."), *accepted by* 2016 WL 3951401 (C.D. Cal. July 20, 2016).[11]

---

[11] At the MSJ hearing, Plaintiff's counsel urged the Court, in response to this case parenthetical, to consider *Wainwright v. Procunier*, 446 F.2d 757 (9th Cir. 1971) (*per curiam*), for its purported discussion of section 314(1)'s lewdness requirement.  That case dealt with the arrest of a man who had urinated in an abandoned service station, the probable cause for which the arresting officer listed as a violation of, *inter alia*, section 314(1).  *Id.* at 758–59.  The Ninth Circuit provided one of Webster's definitions for "lewd" ("lustful, libidinous, lascivious, unchaste" with synonyms including "licentious,

Plaintiff alleges that her arrest constituted an unlawful seizure in violation of the Fourth and Fourteenth Amendments because "freely going natural from the waist up" is not punishable under section 314(1).  FAC at ¶¶ 49; *see also id.* at 53 (indecent exposure statute does not apply to female breasts), 63 (seizure and arrest without reasonable suspicion or probable cause); Opposition at 20 [Doc. # 64] (describing hers as "[a]n unreasonable and arbitrary arrest for violating no law").  Section 314(1) of the California Penal Code punishes "[e]very person who willfully and lewdly . . . [e]xposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby."  As Defendants point out, California courts have yet to interpret this statute in the context of the female body, and it also appears that California courts also have yet to expressly interpret the term "private parts" in the context of the statute, contrary to Plaintiff's insistence otherwise.  *Compare People v. Carbajal*, 114 Cal. App. 4th 978, 982 (2003) ("[W]e note the remarkable absence of case law interpreting the language of Penal Code section 314, subdivision 1."); *with* Opposition at 13 ("The interpretation of the elements of [section 314(1)] has been well settled and beyond debate for many years in the State of California.").

In *People v. Massicot*, the California Court of Appeal interpreted the statute's "exposes his person" provision to require exposure of the "entire unclothed body, including by necessity the bare genitals."  97 Cal. App. 4th 920, 924–26 (2002).  Indeed, the "private parts" portion of the statute was not at issue in that case.  *Id.* at 925.  While the California criminal jury instruction for indecent exposure requires the prosecution to prove that "[t]he defendant willfully exposed (his/her) genitals," the instruction lists only

---

lecherous, dissolute, sensual, debauched, impure, obscene, salacious, pornographic") and concluded that the District Court erred in finding probable cause because the "knowledge possessed by the arresting officer at the time . . . was wholly insufficient [to] cause him, as a prudent person, to have reasonable cause to believe" that the man was violating, or had violated, section 314(1).  *Id.* at 759–60.  This does not clarify the ambiguity of section 314(1), as the Court explains below.  Further, this case *preceded* the California Supreme Court's express ruling on the meaning of "lewdly" within section 314(1).  *See, e.g.,* *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997) (when determining issues of California law, federal courts apply state law "as . . . the California Supreme Court would apply it").

1    *Massicot* as the authority for such a requirement, which, as explained, did not expressly
2    decide the issue relating to the "private parts" language.  *See* Judicial Council of Cal.,
3    Crim. Jury Instrs., No. 1160, Authority.

4        The seminal indecent exposure case, *In re Smith*, is similarly distinguishable.  7
5    Cal. 3d 362 (1972).  There, the California Supreme Court considered only the meaning of
6    "lewdly" in the statute and held that "a conviction of [indecent exposure] requires proof
7    beyond a reasonable doubt that the actor not only meant to expose himself, but intended
8    by his conduct to direct public attention to his genitals for purposes of sexual arousal,
9    gratification, or affront."  *Id.* at 366; *see also Nunez v. Holder*, 594 F.3d 1124, 1134 (9th
10   Cir. 2010) ("lewdly" in section 314 satisfied by not only sexual gratification but also "an
11   intent on the part of the actor to 'insult' or 'offend' in a sexual way").  There, the
12   petitioner was convicted for sunbathing, nude and on his back, on a beach, so the Court
13   never endeavored to interpret the scope of "private parts" or "his person" within the
14   meaning of the law.  *Id.*

15       Furthermore, the Penal Code does not define "private parts."  *See Massicot*, 97 Cal.
16   App. 4th at 928 (noting the "absence of express definitions in section 314").   As
17   Defendants point out, however, it does define a similar term in a related statute.
18   Specifically, section 647, which governs disorderly conduct, defines "intimate body
19   parts" in the context of the intentional distribution of "the image of an intimate body part
20   or parts of another identifiable person" as "any portion of the genitals, the anus *and in the*
21   *case of a female, . . . any portion of the breasts below the top of the areola, that is either*
22   *uncovered or clearly visible through clothing*."  Cal. Pen. Code § 647(j)(4)(C) (emphasis
23   added).

24       In light of the unresolved statutory interpretation of "private parts" within section
25   314 and the Penal Code's analogous statutory terms, the Court cannot conclude that the
26   right to be free from arrest for indecent exposure for the public display of the female
27   breast, including the nipples and areolas, is sufficiently clear to preclude the qualified
28   immunity defense.  This Court recognizes that there is law to suggest that "private parts"

means genitals specifically.  For example, the *Massicot* Court noted in *dicta* that this was most likely the case.  *See* 97 Cal. App. 4th at 925 n.3 ("The trial court instructed the jury that the term '"private part[s]" refers to one's genitals.'  In supplemental briefing, the People concede the term refers to the genitals.  Indeed, the dictionary definition of the term 'private parts' is 'the external genitalia and excretory organs.'  The Oregon high court has expressly held the term "private parts" to be synonymous with one's genitals." (citations omitted)).  This alone, however, is insufficient to place the statutory question beyond debate.

The Officer Defendants here could have reasonably interpreted "private part" to include the definition of "intimate body part," and—in light of their observation of Plaintiff drawing attention to her fully exposed breasts, appearing to enjoy the attention received and public response elicited in a crowded area, where adults and children were congregated, and in some cases were, offended—concluded that she was willfully and lewdly exposing her private parts.  As explained, the California Supreme Court has held that "lewdly" under section 314(1) means the exposure of private parts "for purposes of sexual arousal, gratification, or affront."  *Smith*, 7 Cal. 3d at 366.  This interpretation is similar to the plain meaning definition:  "sexually unchaste or licentious," "obscene," "vulgar."  Merriam-Webster, *Lewd* (2017).  While Defendants have not presented evidence of the Officer Defendants' express belief that Plaintiff's conduct was sexually motivated, they have testified as to their reasonable belief that her conduct was lewd or engaged in with the intent to affront:  Weston and Fernandez based their opinion in part on Plaintiff's calling attention to her fully exposed breasts; Fernandez felt additionally that Plaintiff was gratified by the attention she was receiving on account of her full breast exposure; and Martinez explicitly testified that he believed Plaintiff was exposing her breasts as an affront—to challenge social norms and offend people.  Weston Depo. at 50:22–24; Fernandez Depo. at 37:1–2, 37:9–19; Martinez Depo. at 90:9–12.  The Court cannot conclude that the Officer Defendants' observations of Plaintiff's behavior, and corresponding interpretations that such conduct was lewd, are unreasonable as a matter of

law.  The Officer Defendants' judgment "may have been mistaken, but it was not 'plainly incompetent.'"  *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012).

The Officer Defendants' reasonable, albeit possibly mistaken, interpretation of section 314(1), in turn, supported Plaintiff's initial detention and subsequent arrest for and booking under California's indecent exposure law.  *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (brief, investigatory stop justified when the officer has "a reasonable, articulable suspicion that criminal activity is afoot"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").  Indeed, Fernandez's stated intent to arrest Plaintiff based on his belief that she was attempting to flee or resist him does not change this.  *See Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004) ("[An arresting officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. . . .  '[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" (quoting *Wren v. United States*, 517 U.S. 806,813 (1996))); *see also* Cal. Pen. Code § 148(a)(1) ("Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office" is guilty of a misdemeanor).  The Court thus cannot conclude that Plaintiff had a clearly established right to be free from an arrest for indecent exposure under California law in the precise circumstances of her case.

Qualified immunity therefore bars Plaintiff's claim for unlawful seizure, and the Court **GRANTS** the MSJ in Defendants' favor on this claim.

### 2.    Unreasonable and Excessive Force

Plaintiff alleges that the Officer Defendants used force against her, "the severity and quantity" of which "grossly exceeded that necessary to achieve a lawful

governmental purpose," without any provocation or legal justification.  FAC at ¶ 79.  First, the Court agrees with Defendants that only Fernandez may be subject to Plaintiff's excessive force claim because it is undisputed that he was the only defendant to use force on Plaintiff during her detention and arrest.  SUF ¶ 49; *see Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation:   there is no respondeat superior liability under section 1983.").  Accordingly, the Court **GRANTS** the MSJ in favor of Officer Defendants Weston, Martinez, Young, and Vidal on the ground that they used no force against Plaintiff.

The Court turns next to the constitutional inquiry in the context of Fernandez's use of force in detaining and arresting Plaintiff.  In *Graham v. Connor*, the United States Supreme Court instructed that "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  490 U.S. 386, 396 (1989).  Although "there are no *per se* rules in the Fourth Amendment excessive force context," precedent provides that courts "consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

Even viewed in the light most favorable to Plaintiff, the facts surrounding Fernandez's use of force cannot establish a constitutional violation.  While indecent exposure in this instance may constitute a minor offense, the uncontroverted evidence shows that Plaintiff actively resisted Fernandez's continued restraint of her.  The video footage shows that for several seconds of the initial detention, Plaintiff stood still, but then she attempted to escape Fernandez's grasp, and she continued to resist him up until she was placed in the police vehicle.

Moreover, there is no indication that Fernandez held her arm too tightly or exerted too much pressure in restraining her, or that she was in pain while restrained by the light pole.  *See Injeyan v. City of Laguna Beach*, 645 F. App'x 577, 580 (9th Cir. 2016) (qualified immunity barred excessive force claim "where the arrestee did not display any signs of pain during the handcuffing").  Plaintiff's account of the events similarly lacks any indication of constitutionally unreasonable force.  *See* Ma Depo. at 167:13–15 ("Q[uestion:]  [W]hat did he [Fernandez] do with his body? What did he do physically? A[nswer:]  I don't remember the specifics."), 168:3–8 ("[Question:]  [W]hen you say you remember he arrested you, what do you mean?  What does arrest mean?  What does that mean that happened. . . .  A[nswer:]  He tried to—he pulled both my hands behind my back."), 170:13–15 ("Q[uestion:]  I just want to know how you get from point A, which is the light pole, to point B, the table.  A[nswer:]  I do not recall.").  In fact, her testimony supports Fernandez's belief that she was resisting.  *See id.* at 170:16–25 (Plaintiff moved her body in response to Fernandez' unspecified force of putting her hands behind her back).  Additionally, Plaintiff's testimony that Fernandez's force placed undue pressure onto her shoulder, without more, cannot sustain a claim of excessive force.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (plaintiff's excessive force claim where officer used physical force to handcuff her was "unsupported as she d[id] not provide any medical records to support her claim that she suffered injury as a result of being handcuffed").

Given that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion," and that there is no evidence of the application of disproportionately severe force here, Plaintiff's excessive force claim fails under the constitutional violation inquiry.  *Graham*, 490 U.S. at 396.  This is so despite the fact that the reasonable use of force is often a fact-specific jury question.  *See Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994) (use of pain compliance techniques on non-resisting protestors, which resulted in complaints of bruises, a pinched nerve, and a broken wrist, was objectively reasonable); *Walker v. Benter*, 41 F. Supp. 2d

1067, 1074 (C.D. Cal. 1999) (evidence was "insufficient, as a matter of law, to establish a Fourth Amendment excessive force claim" where officer "grabbed [the suspect]'s hands by the wrists, twisted his arms behind his back, and handcuffed him").

Because the facts, even when viewed in the light most favorable to Plaintiff, do not give rise to a constitutional violation, qualified immunity bars her excessive force claim.[12]   The Court thus **GRANTS** the MSJ in favor of Defendant Fernandez on this claim.

### 3.   Due Process

Plaintiff's due process claim is rooted in her allegedly unlawful seizure.  *See* FAC at ¶ 77.   This claim fails for the same reasons that Plaintiff's unlawful seizure claim fails—under the clearly established prong of qualified immunity.   Plaintiff has failed to make a showing that her detention or arrest violated her clearly established rights.  *See* Part V.A.1, *supra*.   The Court thus **GRANTS** the MSJ in favor of Defendants on the due process claim.

### 4.   Equal Protection—Gender-Based Discrimination

Much like the claims discussed above, Plaintiff's equal protection claim is also based on her allegations that the Officer Defendants unlawfully detained and arrested her. *See* FAC at ¶¶ 74, 77.   Although the FAC's gender-based discrimination allegations are conclusory and without much detail, Plaintiff's Opposition proceeds on the theory that the Officer Defendants discriminated against her by seizing and arresting her under Penal Code section 314(1) for exposing her (female) nipples and areolas, whereas the same conduct undertaken by a male protester would not result in an arrest for indecent exposure.  *See* Opposition at 28–29; *see also* SUF ¶ 88 (Young does not know of, and Fernandez has not made any, arrests of a male in the City for appearing in public with his nipples fully exposed).

---

[12] The Court also notes that Plaintiff has not presented any authority placing her right to be free of force that applies pressure onto her shoulders during an attempted arrest beyond debate.   The excessive force claim thus also fails under the clearly established prong.

As with the due process and unlawful seizure claims, this claim fails on the basis of qualified immunity.  Plaintiff has not presented any authority that an arrest for indecent exposure under California law, based on the complete exposure of female breasts, violates her clearly established rights.  While she cites Supreme Court and Ninth Circuit case law that generally discusses the development of the Equal Protection Clause in the context of women's rights, these cases define equal protection rights at too high a level of generality.  *See* Opposition at 29 (collecting cases).  Indeed, even the recent Free the Nipple cases from the District of Colorado do not help Plaintiff's case.  *See Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 237 F. Supp. 3d 1126 (D. Colo. 2017); *Free the Nipple v. City of Fort Collins*, 216 F. Supp. 3d 1258 (D. Colo. 2016).  While the District Court there enjoined, on equal protection grounds, the city from enforcing a local ordinance that prohibits women (but not men) from knowingly exposing their breasts in public, and concluded that the plaintiffs' related equal protection claim survived the defendant's motion to dismiss, those cases were decided after the Officer Defendants' conduct here.  *Free the Nipple-Fort Collins*, 237 F. Supp. 3d at 1130–33 (February 2017); *Free the Nipple*, 216 F. Supp. 3d at 1264–66 (October 2016); *see, e.g.*, *al-Kidd*, 563 U.S. at 741 (clearly established inquiry considers the state of the law "at the time of the challenged conduct").  Moreover, those cases analyzed a law that specifically prohibited the public exposure of female breasts—not a statute with ambiguous language that left room for the Officer Defendants' reasonable interpretation.

The Court thus **GRANTS** the MSJ in favor of Defendants on Plaintiff's equal protection claim based upon the Officer Defendants' qualified immunity.

**5.    First Amendment Retaliation**

Plaintiff contends that the Officer Defendants "were deliberately indifferent" to her First Amendment rights "by retaliating for her exercise of freedom of speech and expression" at the sanctioned political event for then-candidate Sanders.  Opposition at 20; *see also* FAC at ¶ 89.  Again, this claim fails because Plaintiff has not satisfied her burden of showing that her First Amendment right to expose her breasts in public was

clearly established, such that her detention and arrest for engaging in such conduct violated her free speech rights.  *See Dennis v. United States*, 341 U.S. 494, 513 (1951) (plurality) ("Whether the First Amendment protects the activity which constitutes the violation of the statute must depend upon a judicial determination of the scope of the First Amendment applied to the circumstances of the case.").  Plaintiff presented the Court with no authority that such a right was clearly established at the time of her detention and arrest.  In fact, the Court's independent research reveals that conduct like Plaintiff's has been found to be unprotected activity, at least by one court.  *See Free the Nipple v. City of Fort Collins*, 216 F. Supp. 3d 1258, 1263 (D. Colo. 2016) (conduct of appearing topless in public, in protest of local ordinance, does not warrant First Amendment protection).

Furthermore, despite the "broad general proposition" that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for his speech, the Supreme Court "has never held that there is such a right" "to be free from a retaliatory arrest that is otherwise supported by probable cause."  *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012).  Here, the uncertainty surrounding the interpretation of section 341(1) supports the Officer Defendants' reasonable belief that Plaintiff violated the statute, as explained above, such that her arrest for indecent exposure does not constitute a constitutional violation.

The Court thus **GRANTS** the MSJ in favor of Defendants on the First Amendment claim on the basis of qualified immunity.

**B.   *Monell* Claim**

Plaintiff vaguely alleges that the Municipal Defendants maintain "policies, practices[,] and customs" that condone unconstitutional use of excessive force, and that they, with deliberate indifference, have failed to train police officers sufficiently to prevent the type of constitutional violations Plaintiff suffered.  FAC at ¶¶ 102–03.  A government entity may be held liable under 42 U.S.C. section 1983 when "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of

constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). To establish such liability, Plaintiff must prove the following: "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Id.* (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cty. Of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

With regard to the alleged policy that condones excessive force, Plaintiff has presented no evidence whatsoever to support the existence of such a policy. Based on this evidentiary record, the Court **GRANTS** the MSJ in favor of Defendants insofar as the *Monell* claim is premised on a policy that engenders rampant use of unlawful and excessive force.

As for Plaintiff's failure to train claim, "inadequacy of police training may serve as the basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). In other words, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, . . . the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. It is not clear precisely what training the Municipal Defendants have failed to provide with respect to Plaintiff's alleged constitutional violations. Given that all of Plaintiff's constitutional claims are premised on the allegedly unlawful seizure of her in connection with section 314(1), however, the Court proceeds under the assumption that she intends to pursue a *Monell* claim in connection with the Municipal Defendants' purported failure to properly train officers on the lawfulness of an arrest for indecent exposure based on the full exposure of female breasts, including the nipples and areolas.

There is no evidence of deliberate indifference to training here. Fernandez, Weston, and Young all testified that they understand, from their police training at the

Academy and subsequent seminar training, the full exposure of the female breast, including the nipples and areolas, may, with the requisite *mens rea*, constitute an offense under section 314(1).  But, as explained above, it is not altogether clear that this belief is incorrect.  *See* Part V.A.1, *supra*.  Furthermore, there is no evidence that arrests under section 314(1) are so prevalent in connection with female breast exposure that any failure of the Municipal Defendants to provide extensive training to LAPD officers or Academy students on the statutory guidelines of California's indecent exposure law will result in recurring constitutional rights violations.  *See* Palazzolo Depo. at 8:22–24, 66:14–24 [Doc. # 67-13] (in his over-27 years with the LAPD, he is aware of "very few" female arrests under section 314(1));[13] *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (plaintiff may show a failure to train policy without showing a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations").  And Plaintiff certainly failed to present evidence of "a pattern of tortious conduct by inadequately trained employees" to show the lack of proper training by Municipal Defendants under that theory of *Monell* liability.  *Long*, 442 F.3d at 1186.

Moreover, based on the evidence of Plaintiff's conduct while Fernandez detained her, the Court cannot conclude that she proved any violation of her constitutional rights.  As explained above, she has not shown that she had a constitutional right to fully expose her breasts on Los Angeles City streets or that Fernandez lacked probable cause to arrest her.  *See* Part V.A.1, *supra*.

In sum, Plaintiff's *Monell* claim fails, and the Court thus **GRANTS** the MSJ in favor of Municipal Defendants.

**C.    State Law Claims**

---

[13]  Defendants' evidentiary objection to page 8 lines 22–24 and page 66 lines 17–25 of the Palazzolo deposition testimony is **OVERRULED**.  This testimony is probative of Plaintiff's ability to establish a *Monell* claim.

As there are no claims remaining under federal law, the Court declines to address the remaining state law claims or to exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(c)(3); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010). In considering whether to exercise supplemental jurisdiction, a court should weigh factors such as "judicial economy, convenience, fairness, and comity," which, "[i]n the usual case in which all federal-law claims are eliminated before trial . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

## VI.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** the MSJ on all of Plaintiffs' federal claims.  The Court declines to exercise its supplemental jurisdiction over the state law claims and **DISMISSES without prejudice** the remaining state law causes of action.  All scheduled dates and deadlines are VACATED.

**IT IS SO ORDERED.**

DATED: September 11, 2017

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-26-